WILLIAM B. PARKER, plaintiff in error, vs. FRANCIS S. JOHNSON, administrator of Henry W. Dorsey, deceased, defendant in error.

[1.] In a case in the last resort, when the witness is in Court, and counsel on each side are to be heard on the evidence, his testimony ought to be received,

notwithstanding the case may have been partially argued before the jury, the opposite party not being surprised by its reception.

[2.] Charge to the jury that they might find according to the weight of probability, that which ever way they believed the weight of probability to be, they might find, is erroneous; the *evidence* should so preponderate in favor of the party for whom the verdict is rendered, as to satisfy the jury that he is entitled to it.

[3.] If verdict be decidedly against the weight of evidence, new trial should be granted.

Assumpsit, on warranty, in Bibb. Tried before Judge HARDEMAN, at November Term, 1857.

Francis Johnson, administrator, sued the defendant on warranty of soundness of a negro sold by said defendant to said Johnson's intestate.

On the trial, plaintiff first introduced a bill of sale, signed by defendant and conveying to him for $600 a negro girl named Rose, and warranting her to be sound in body and in mind, dated November 27th, 1855.

*Dr. Boon* testified: That at the request of Wm. P. Phillips, he made a *post mortem* examination of said negro girl, January 30th, 1856, together with Dr. Hammond, understood the negro died the night before. He found a large quantity of water in the chest near the region of the heart; the liver was greatly enlarged, and the pleura was attached to the ribs. She had evidently what is known as pericordial dropsy and no doubt died from it, and gives it as his opinion, she had had it more than three months; was satisfied it was a chronic case of long standing. He never saw her in life; found the body in possession of Wm. R. Philips. The defendant was not present at the *post mortem* examination, nor was he or his family physician notified or requested to attend as witness was aware of. Did not examine the stomach or any part of the body except as stated. Does not remember whether the heart was found to be diseased or not.

Pericordial dropsy is usually attended with symptoms, before it results in death, such as difficulty and shortness of breathing, depression of spirits, heaviness in the chest, palpitation of the heart, &c., and these symptoms are increased by active labor or severe exercise of any sort. It is possible for the disease to exist, however, without evidencing its presence by symptoms. Witness had no doubt that the disease existed at the time of the purchase by plaintiff from defendant.

*Philips* testified: That about the 27th of November, 1855, his brother Wm. R. Philips brought Rose to the place where he had Dorsey's other negroes; there was no other negro in the lot named Rose; she was the one who died 29th January, 1856. She never complained once, from the time she was brought, up to her death; was in unusually good spirits about bed time of the night she died. She ran away in December 1855, when it was quite cold, and was gone several days; don't know how long, or whether she was in the woods or not, or where whilst runaway. Said negro was well treated. Wm. R. Philips was a silent partner of Dorsey's.

*Dr. Hammond* testified to substantially the same facts as Dr. Boon, and stated further, that he recollected that the heart was diseased also; found it enlarged and the left auricle diseased. His opinion was, that the disease was of long standing, and had existed before November, 1855; thinks it very likely it had existed for a year.

*Dr. H. K. Green* testified: That the negro Rose was in his possession for the two months immediately preceding the sale of her by defendant to plaintiff; left his house the day of the sale. He employed said negro as a cook, washer, and as a house servant. She was constantly employed in cooking or washing or cleaning up the house, or in some other of the varied duties of such a servant. Said negro was not sick a day, never complained a moment that witness ever heard of, had all the appearances of a perfectly healthy negro. Witness is a practitioner of medicine, and is of the opinion that it is impossible that the disease evidenced by

the condition of the chest, as described by Drs. Boon & Hammond, could have existed whilst said negro was in his employ, because he is satisfied that she could not have done the work she did, if she had been thus diseased, without exhibiting marked and distressing symptoms of its presence. The disease described by Drs. Boon & Hammond, pericordial dropsy, is always attended with very distressing symptoms, such as shortness of breath and difficulty of breathing, a sense of heaviness in the chest, great depression of the spirits, palpitation of the heart, as well as pain, &c. Any kind of active labor or severe exercise is sure to develop such symptoms. The disease described by them might come on in a month, or even in a less time, and particularly if the patient had been much exposed to cold, &c.

*Dr. Parker* testified: That the negro Rose, was in his employment for the five or six months immediately preceding the time she was with Dr. Green, and did the same work which Dr. Green testified she did for him. The negro was sick not a day or an hour whilst she was with him, and never once complained, that he ever heard, except one day, she complained of a slight pain in her knee, which passed off of itself in a few hours, and witness never heard of it again. She never took a dose of medicine whilst with him, that he ever heard of, and had the appearance of being a perfectly healthy negro all the time. He is a physician, and is of the opinion that the disease disclosed upon *post mortem* examination could not have existed whilst said negro was in his employ, because, if it had, witness does not believe she could possibly have done the work she did at his house. Pericordial dropsy is always attended with distressing symptoms which are greatly increased by active labor, particularly that kind of labor which requires the body to be held for a length of time in a bending posture, such as washing or cooking.

The disease described by Drs. Boon & Hammond, frequently produces as bad a condition of the heart, liver, pleura, and chest, as was found at the *post mortem* examination,

within three or four weeks, and often results in death in less than that time. Witness is decidedly of the opinion from the facts already given in evidence, that the negro could not have had the disease referred to, and of which it is said she died, as far back as the 27th of November, 1855.

*Francis S. Johnson* testified: His intestate when in life entered into an agreement with William R. Philips, by which it was agreed that Henry W. Dorsey should advance all the capital from time to time, as he might see fit, to Philips, who should lay out the same in the purchase of negroes, said Philips to buy and sell negroes with the capital so furnished, and give his time and attention to the interest of the business.

The titles to all purchases to be taken in the name of Henry W. Dorsey, and said property, and all assets arising therefrom to be and remain the property of Henry W. Dorsey, and all the business to be done in his name. Sometime after the institution of the present suit, Henry W. Dorsey died, and Johnson became his administrator and called on Philips for the property, assets and funds in his hands of Henry W. Dorsey. Philips was to receive as a mode of compensation for his services, an equal share in the profits of said business, and on that basis, witness settled with said Philips and received the claim now and then in suit, as part of said assets of Henry W. Dorsey. Witness was made plaintiff in place of Henry W. Dorsey. Witness has fully settled with Philips, except as to this and some other claims on which Philips is entitled to the one full half of what may be recovered in this suit, as a partner, and the firm debts are fully paid.

The evidence here closed; and defendant by his counsel moved the Court to nonsuit the plaintiff and dismiss his action on the ground, that Henry W. Dorsey being dead, and it being shown that Wm. R. Philips was a dormant partner of said Dorsey, the suit should be in his name, as surviving

Parker vs. Johnson, adm'r.

partner, and not in the name of the administrator of Dorsey, and that the administrator of Dorsey, had no right to recover.

The Court refused the motion, and ordered the cause to the jury.

After defendant had examined Dr. Parker, he had Dr. Gabriel Harrison, who had been subpœned, and was in attendance when defendant announced ready, called at the door to be examined as a witness, but the witness not responding, the case went to the jury without his testimony, and was opened by B. Hill, Esq. for the plaintiff. Clifford Anderson, Esq. followed Mr. Hill for defendant, it being understood and announced to the Court that Mr. Lochrane for defendant, and Mr Stubbs for plaintiff, would follow in conclusion. Pending Mr. Anderson's argument, Court adjourned for dinner, and on meeting in the afternoon, and before Mr. Anderson resumed his argument, defendant's counsel stated to the Court, that during the recess for dinner, they had seen Dr. Harrison and enquired why he left before the evidence was gotten through with ; that Dr. Harrison stated in reply that he left under the impression that the defendant had determined to introduce no testimony mistaking the defendants counsel's explanatory remarks to the jury in reference to the nature of the defence, as a speech upon the merits of the case.   Defendant's counsel then stated to the Court, that they had ascertained from Dr. Harrison, since the adjournment for dinner, that he would testify that he had a case in his own practice which resulted in death, when upon examination of the patient after death, the same evidence of disease substantially, were discovered in the chest, as those found by Drs. Boon & Hammond, in the chest of the negro in question, and he was satisfied that his patient was perfectly sound and healthy two weeks before his death, about which time he exposed himself greatly, and was seriously injured at a fire in the city, upon which the diseased condition of the chest, as described, supervened.

Parker vs. Johnson, adm'r.

Defendant's counsel after making this statement, informed the Court that Dr. Harrison was in Court, and moved that he be permitted then to testify, which motion the Court refused, and defendant excepted.

The Court charged the jury, that notwithstanding Philips was a dormant partner of Dorsey in the purchase and sale of negroes, and as such entitled to one-half interest in all negroes bought; yet upon Dorsey's death, the right of action upon the warranty of any negroes thus owned was in Dorsey's administrator, and not in Philips as surviving partner, &c.

That they might find according to the weight of probability; that it was generally impossible in a case like this, to arrive at certainty, and the jury were not to consider the facts as they would in a criminal case, and refuse to find for the plaintiff, because they might have reasonable doubts as to the existence of the disease at the time of the sale; that whichever way they believed the weight of probability to be, they were authorized to find.

Defendant's counsel requested in writing, the Court to charge the jury, that if Philips & Dorsey were partners in business, owning this woman, with other property, and Dorsey one of the partners died whilst they owned this woman, or after her death, then all the partnership effects and rights of action belonged to Philips as surviving partner, and Dorsey's administrator has no such interest as will enable him to recover.

That if the jury have strong reasonable doubts, whether the negro was diseased on the 27th of November, 1855, they must find for defendant.

Which the Court refused, and defendants excepted to the charge and refusal to charge, as requested.

The jury brought in a verdict for the plaintiff for the $600 purchase money, with interest from the 30th January, 1856.

Defendant moved the Court for a new trial:

1st. Because the verdict is strongly and decidedly against the weight of evidence.

2d. Because the Court erred in not granting a nonsuit, and dismissing plaintiff's action on motion of defendant.

3d. Because the Court erred in not permitting Dr. Harrison to testify at the time when defendant requested it.

4th. Because the Court erred in refusing to charge as requested.

5th. Because the Court erred in its charge to the jury.

Because the verdict of the jury is illegal in finding interest as part of the damages.

Which motion the Court refused. Whereupon counsel for defendant excepted and assign error.

LOCHRANE, LANIER & ANDERSON, for plaintiff in error

STUBBS & HILL, for defendant in error.

*By the Court.*—McDONALD, J. delivering the opinion.

Most of the grounds taken in the motion for a new trial, are abandoned in this Court, by the plaintiff in error. We shall, therefore, refer to those only on which we place our reversal of the judgment in the Court below.

[1.] At the time it was proposed to examine Dr. Harrison, one counsel on each side had to address the jury; the case was on its final trial before a special jury; the counsel for the plaintiff did not claim surprise; that his witnesses to rebut, if any, had been discharged; or the like. There was no sufficient reason brought to the mind of this Court, to require it to hold that in a case in the last resort, when the witness is in Court, and counsel on each side are to be heard on the evidence, the testimony should not be heard, notwithstanding the case may have been partially argued before the

jury It would certainly be a more convenient practice for counsel who do not intend to waive the testimony of a witness who absents himself under the circumstances which Dr. Harrison did, to make it known to the Court, as soon as the absence of the witness is known, and to make such motion as the interest of his client requires. The majority of this Court think that the testimony of Dr. Harrison ought to have been given. I think myself that as the cause was in the last resort, and counsel on both sides were to be heard, it ought to have been received, if competent. My doubt is on that point, and I have a pretty fixed opinion, that according to the facts stated in his affidav't, it was inadmissible. It was a verbal report of a single case which had occurred in his practice, which it was proposed he should testify to. Medical books, of authority in that profession, cannot be read. *Collier vs. Simpson,* 5 *Carrington & Payne* 73. If Dr. Harrison had reported his case in a Medical Journal, it could not have been read. There is a good reason for excluding particular cases. There may have been an idiosyncrasy in the subject of the treatment; the symptoms may have been fallacious; the causes producing the disease may have been different from those superinducing the disease in the case under examination, and numerous other reasons might be assigned for excluding evidence of particular cases, to influence the decision of a cause depending, often, on its own peculiar facts. The rule which admits professional opinions to be received as evidence, a kind of evidence so little reliable, and so fraught with danger to those whose rights and interests it is to affect or control, ought not to be extended. My brethren are, however, clear that the evidence was admissible and ought to have been received.

[2.] The action being on the warranty of soundness of the negro sold, whether the negro was diseased at the time of the sale and warranty, was a matter of great consequence. The evidence was conflicting on this point, and the Court

instructed the jury, "that they might find according to the weight of probability;" that "the jury were not to consider the facts as they would in a criminal case, and refuse to find for the plaintiff, because they might have reasonable doubts as to the existence of the disease at the time of the sale; that whichever way they believed the weight of probability to be, they were authorized to find."

The plaintiff must make out his case to the satisfaction of the jury. He must not leave it doubtful, either from the circumstances which surround it, or from the character of his witnesses. *Long vs. Hitchcock*, 9 *Car. & Payne* 619. There was no positive evidence in the case, in regard to the commencement of the disease, or the existence of it at the time of the warranty. It depended on circumstances testified to, and some of these circumstances were conclusions of fact drawn by Medical gentlemen of skill and science in their profession, from certain indications of disease found on a *post mortem* examination of the diseased negro. Other Medical gentlemen of like skill and science, testified of their knowledge of the negro while in life, and from that knowledge, drew conclusions of fact, directly the reverse of those testified to by the physicians who made the *post mortem* examination. These facts and all other matters in proof, ought to have been well weighed and considered by the jury, and according to the weight of the evidence they should have found their verdict. We think that the charge to the jury that " whichever way they believed the weight of probability to be, they were authorized to find," is not sustained by the law, and was calculated to mislead the jury. Under this charge, the jury might have collected, on each side, every circumstance which they considered as giving rise to a probability, and putting them in opposite scales, there might have been a slight preponderance in favor of the plaintiff, but not sufficient to satisfy them that he was entitled to a verdict; and yet under the charge "that according to the weight of probability, they were authorized to find a

verdict," they may have found the verdict rendered in the cause. Upon weighing probabilities, it might be found that there was the preponderance of a slight probability in favor of one of the parties, but not of that decided character to satisfy the mind that the right was with that party. The *evidence* should so preponderate in favor of the party for whom the verdict is rendered, as to satisfy the jury that he is entitled to it.

[3.] We regret when we send a cause back for a new trial, to be compelled to remark on the evidence. We find it necessary, however, when a point is made in the record, involving the proofs in the case, which it is indispensible to decide. One of the grounds in the motion for a new trial is that the verdict of the jury is decidedly and strongly against the weight of evidence. One of the principal issues in the cause, I may say the main issue, was whether the negro Rose was afflicted with the disease of which she died at the time of the warranty. She was sold, and her soundness of body and mind warranted, on the 27th November, 1855. She died suddenly on the 29th day of January afterwards, and she died of pericordial dropsy. These facts, I apprehend, are indisputable. The question in controversy is whether she was diseased on the 27th day of November, 1855. Two physicians, Drs. Boon & Hammond, think she was. They so give their professional opinion; the former that her disease was chronic and she had it at least three months before her death, and the latter, that she may have had it for more than a year. He says also, her heart was diseased. It was enlarged, and the left auricle was diseased.

The witness Philips testified, that the negro was carried to the place where he had Dorsey's other negroes, about the 27th November, 1855, and she ran away in December, and was gone for several days, when it was quite cold. She was well treated. She never complained once, from the time she was carried to the place, and was in unusually good spirits about bed time of the night she died. Dr. Boon testified, that peri-

cordial dropsy is usually attended with symptoms, before it results in death, such as difficulty and shortness of breathing, depression of spirits, heaviness in the chest, palpitation of the heart, &c. &c.; and these symptoms are increased by active labor or severe exercise of any sort. He says it is possible for the disease to exist without evidencing its presence by symptoms. This was the plaintiff's evidence on this issue, and if there had been no evidence on the other side, it clearly warranted the finding in favor of the plaintiff. Giving full effect to the professional opinions of the gentlemen examined by the plaintiff, they established a case of fatal disease at the time of the warranty, and sustain the verdict given by the jury, without referring to defendant's proof.

For the defendant, it was proven by Dr. Green that he is a practicing physician, that he had possession of the negro for two months immediately preceding the sale. She left his house on the day of the sale. She was constantly employed, when he had her, in cooking, washing, cleaning up the house, &c. She was never sick a day, and never complained for a moment that he ever heard of, and had all the appearance of a perfectly healthy negro. He gave it as his opinion, that it was impossible she could have been afflicted with the disease evidenced by the condition of the chest, described by Drs. Boon & Hammond, while she was in his employment, because he was satisfied that she could not have done the work she did, if she had been thus diseased, without exhibiting marked and distressing symptoms of its presence. The symptoms of the disease he described as Dr. Boon, saying that they always attend it, and that any kind of active labor or severe exercise, is sure to develope them. He said further, that the disease as described by them, might come on in a month or even in less time, and particularly, if the patient had been much exposed to cold.

Dr. Parker testified, that the negro was with him for five or six months immediately preceding the time she was with

Dr. Greene, and was not sick a day or an hour while she was with him, and he never heard of her complaining, but once, and that was of a slight pain in the knee which passed off of itself in a few hours. She had the appearance of a perfectly healthy negro all the time. He is a practicing physician and did not believe that the disease discovered on the *post mortem* examination could have existed when the negro was with him, because he did not believe, that with it, she could possibly have done the work she did. He spoke of the symptoms as always distressing, and as being greatly increased by active labor. He said the disease described by Drs. Boon & Hammond, frequently produced, within three or four weeks, as bad a condition of the heart, liver, pleura and chest, as was found in this case, and often results in death in less than that time. Did not think she could have had the disease as far back as 27th November, 1855.

This was the evidence of the defendant on the same issue; and giving full effect to the professional opinions of the physicians examined by him, the disease could not have existed at the time of the sale, and the verdict of the jury could not on that evidence alone be sustained.

Each party was entitled to a verdict then, according to the testimony submitted by himself exclusively. But in arriving at a conclusion, the evidence must be collated. Dr. Hammond, the record says, substantially supported the evidence of Dr. Boon, and he must therefore be taken to have described the symptoms of the disease as he did. There is nothing in the record before us to show that the witnesses testifying in the cause are not all entitled to equal credit. We will refer to the testimony. According to Dr. Boon's evidence, the general rule is that pericordial dropsy is attended with symptoms before it results in death. But he says, it is possible for it to exist without its evidencing its presence by symptoms. Its existence without symptoms is an exceptional case, then, as such case is *possible* and not *usual*. The

plaintiffs witness, Dr. Boon, says, the symptoms *are increased by active labor and severe exercise.* Dr. Green for defendant, says, *that any kind of active labor or severe exercise, is sure to develop them.* There is no discrepancy in this testimony. It may stand together. Dr. Boon does not say that this disease, if existing in a subject living in a quiet state, indicating no symptom of its presence, would not be *surely* developed, if that subject were put to active labor or severe exercise. If this be true, and the testimony of the witnesses, in this respect, may be reconciled in this way, the verdict is decidedly against the *weight of evidence;* for the evidence of the defendant is, that the negro was kept in active service performing labor down to the day of sale, and exhibited no symptom whatever of disease, and had all the appearance of health. After the sale, for two months and two days, she had led an inactive, quiet life, and down to the night of her death, made no complaint, and exhibited no symptom indicating the presence of the disease.

If, with labor and exercise, the disease would always be developed, and without them, it might not, the inference would be, that it had its origin after her habits of labor and exercise had ceased. In respect to the abstract professional opinions of the witnesses, which I shall not attempt to reconcile, I will remark that, if they be irreconcileable, they balance each other, as the witnesses are equal in number, and nothing appears in the record to entitle the witnesses of one party to more credit than the other.

Judgment reversed.